UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-60703-CIV-DIMITROULEAS

NEBULA GLASS INTERNATIONAL,
INC., d/b/a GLASSLAM N.G.I., INC., a
Florida corporation,
                              Plaintiff,

vs.

REICHHOLD, INC., a foreign corporation,

                    Defendant.
_____/

## PLAINTIFF GLASSLAM'S RESPONSE IN OPPOSITION TO
## DEFENDANT REICHHOLD'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff Nebula Glass International, Inc., d/b/a Glasslam N.G.I., Inc., pursuant to S.D. Local Rules 7.1 and 7.5, hereby respectfully submits this response in opposition to the motion for judgment as a matter of law filed by Defendant Reichhold, Inc.

### INTRODUCTION AND BACKGROUND

In its motion for judgment as a matter of law, Defendant Reichhold attacks virtually every element of Plaintiff Glasslam's case. According to Reichhold, Glasslam failed to prove causation, i.e., that the defective resin caused the delaminating and yellowing clearly visible on the representative samples of glass introduced at trial. Reichhold also contends that all of Glasslam's damages must be set aside, with the exception of approximately $100,000.00, because they are flawed as a matter of law for various reasons. Lastly, Reichhold argues that this Court erred in ruling that the Settlement Agreement which purportedly released the vast majority of the damages in this case (those from Resin 29) was ambiguous. In this response, Glasslam addresses each of these arguments and shows that none of them provide a basis for the relief Reichhold is seeking. Accordingly, Reichhold's motion should be denied.



CASE NO. 02-60703-CIV-DIMITROULEAS

## ARGUMENT IN OPPOSITION TO MOTION FOR JUDGMENT AS A MATTER OF LAW

**I.     Unpaid Future Claims: The cost to replace defective glass is not speculative**

Defendant Reichhold argues that the damages Glasslam sought in this case for unpaid future claims are speculative because the claims have "not ripened into actual quantifiable losses," i.e., Glasslam is not legally obligated to pay the claims.  According to Reichhold, no damages should be awarded for claims where the hurricane glass may have to be replaced "someday."  Reichhold's argument not only ignores the evidence produced at trial and accepted by the jury, but also misapprehends the nature of damages recoverable in a breach of contract action and breach of warranty actions.  As detailed next, Glasslam is entitled to recover those damages that proximately flow from Reichhold's breach of contract and breach of its express and implied warranties.

It is well settled that damage which results in solely economic losses is not recoverable in tort, but rather, under contract and warranty law.  *Airport Rent-A-Car, Inc. v. Prevost Car, Inc.*, 660 So.2d 628 (Fla. 1995).  The Florida Supreme Court emphasized in *Airport Rent-A-Car* that "the law of contracts protects one's economic losses, whereas the law of torts protects society's interest in being free from harm."  *Id.* at 632.  In this action, Glasslam has pursued economic losses and has done so under the proper theories of recovery, i.e., breach of contract and breach of express and implied warranties.  Glasslam properly sought — and was awarded — damages that are recoverable under these theories of liability.

In a breach of contract action, the breaching party is responsible for those "damages which flow naturally from the breach, and were foreseeable by the breaching party at the time the contract was entered."  *Scott v. Rolling Hills Place, Inc.*, 688 So.2d 937, 940 (Fla. 5th DCA 1997).  Similarly,

2

CASE NO. 02-60703-CIV-DIMITROULEAS

in a breach of warranty action, the injured party "is entitled to both incidental and consequential damages that are proximately caused by the breach." *Marcus v. Anderson/Gore Homes, Inc.,* 498 So.2d 1051, 1053 (Fla. 4th DCA 1986). The cost to repair a defective product is one type of economic loss which is recoverable under any of these legal theories. *Id.* "Economic loss has been defined as 'damages for inadequate value, *costs of repair and replacement of the defective product,* or consequent loss of profits — without any claim of personal injury or damage to other property.'" *Casa Clara Condominium Association v. Charley Toppino & Sons, Inc.,* 620 So. 2d 1244, 1246 (Fla. 1993). *See also, Arell's Fine Jewelers, Inc. v. Honeywell, Inc.,* 566 N.Y.S.2d 505, 509 (N.Y. App.1991) (economic losses include the cost of replacement or repair of the product).

In the present case, Reichhold manufactured defective resin which Glasslam sold for the production of its high-impact hurricane window system. In manufacturing the defective resin, Reichhold breached its contract with Glasslam and breached both express and implied warranties regarding how the resin would perform in Glasslam's window application. Glasslam established Reichhold's liability for the defective resin, thereby entitling Glasslam to recover, as part of its economic loss, the cost to replace the glass made with Reichhold's defective resin. The cost to replace the defective glass is, contrary to Reichhold's assertions, a quantifiable loss which flows naturally and consequentially from the breach of contract and breach of the applicable warranties. Thus, the damages awarded by the jury for unpaid customer claims are recoverable in this action.

**A.    Glasslam established the cost to replace defective glass at specific jobs through its customers**

None of the specific damages Glasslam claimed at trial are speculative. Speculative damages are damages that are not sufficiently certain as to the amount. Sufficient certainty does not require

3

CASE NO. 02-60703-CIV-DIMITROULEAS

evidence of an exact or precise amount of damage. *Conner v. Atlas Aircraft Corp.*, 310 So. 2d 352,

354 (Fla. 3d DCA 1975). Damages are recoverable "so long as there is a reasonable basis in the

evidence for the amount awarded." *Id.* Uncertainty as the exact amount of damage will not prevent

recovery where it is clear that damage was suffered. *Centx-Rooney Construction Co., Inc. v. Martin

County*, 706 So. 2d 20 (Fla. 4th DCA 1997). Moreover, reasonably based estimates or approximations

of the damage sustained are sufficient proof. *Conner, supra*; (damage estimates provided by

witnesses at trial led to satisfactory conclusion); *Mulford Hickerson Corp. v. Asgrow-Kilgore Co.*,

282 So. 2d 19 (Fla. 4th DCA 1973) (damages need only be ascertainable within a reasonable degree

of certainty; approximate results suffice); *Reitano v. Peninsular Bldg. Supply Co.*, 262 So. 2d 710

(Fla. 2d DCA 1972) (reasonable basis existed for approximation of damage).

Reichhold complains specifically about the *estimated* replacement costs for the "Clark

Residence," the "Spanish Residence," and the Waterford Building, but Carlos Rodriguez and Victor

Prieto testified that these figures are accurate replacement costs based on their years of training and

experience in the laminated glass business. As noted, the law does not require proof of an exact

figure. Reichhold elected not to present contrary damage evidence (i.e., evidence that these estimates

are too high) — which it had every right to do. Given the uncontradicted testimony of these

witnesses, Glasslam presented a reasonable basis for the jury's award of those amounts.

With respect to the other specific awards, Reichhold claims that those damages are speculative

because Glasslam has not already paid them, Glasslam has not been sued, and Glasslam is not legally

obligated to pay them by way of a judgment. These claims include Signature Door, United Glass,

Custom Glass and Aluma Glass. Again, Reichhold misses the point. Glasslam may recover the cost

of replacing the glass installed by these customers because Reichhold breached its contract with

4

CASE NO. 02-60703-CIV-DIMITROULEAS

Glasslam, as well as express and implied warranties, when it supplied defective resin. The defective resin was placed in the windows manufactured by these customers and, as a direct result of the defective resin, the windows delaminate, the resin yellows and the glass will not perform its intended function, i.e., withstanding high-impact missiles as shown in the hurricane testing videotape presented at trial. Glasslam's chemist testified at trial that all of the windows made with Reichhold resin *are defective and will fail*. Thus, as noted earlier, Glasslam may recover the cost of replacing the defective glass as one element of its damage.

In addition, Reichhold is confusing the theory of common law indemnification with the measure of damages recoverable in this action. Glasslam does not have to wait to be sued by its customers or pay claims as they arise *before* it can sue Reichhold and collect for the damages caused by the defective resin. Glasslam did not sue Reichhold for indemnification. Indemnity arises when a defendant discharges another's liability to the plaintiff and then seeks to recover the loss from the other party whose active negligence caused the injury. *Scott & Jobalia Const. Co. v. Halifax Paving, Inc.*, 538 So. 2d 76, 79 (Fla. 5th DCA 1989). Glasslam has not discharged Reichhold's liability to Glasslam's customers because it does not have the financial ability to pay millions of dollars to replace the defective glass. The cost to replace the defective glass flows directly from Reichhold's breach of its contract with and warranties to Glasslam. Thus, Glasslam may recover these damages in order to replace the defective glass — at least with respect to those specific claims that the Court allowed.[1]

---

[1]Reichhold has made the spurious argument that the jury's damage award to Glasslam is a windfall because Glasslam has no legal obligation to replace the defective glass. This argument is not supported by the facts. First, Glasslam has already paid what it could to customers in the way of some direct payments and credits for merchandise. Second, by calling numerous customers as witnesses at trial, those customers are aware that Glasslam may receive the damages awarded by the

**B.      Glasslam established the cost to replace the defective glass at Pensacola Christian**

Reichhold argues again that Glasslam has failed to prove that the laminated glass in the dining hall and auditorium at Pensacola Christian College needs be replaced; thus, the jury's award for the replacement of the glass should be vacated.  Reichhold relies on Norman Foxworth's testimony that "only nine panes of laminated glass" need to be replaced at this time.  Surprisingly, Reichhold has missed the entire import of Glasslam's case.  Glasslam established at trial that Reichhold's resin was defective when it was manufactured *and* that *all* of the glass made with the defective resin *will* fail. Glasslam also established through the testimony of its chemist that the failure rates vary depending upon the level of exposure to ultra violet light, but that all of the glass will fail within one to five years after installation.  This is the evidence in the case that the jury accepted.

The point of Mr. Foxworth's testimony that some panes of glass are now showing delamination was that the failure has *begun* to manifest itself at Pensacola Christian College.  Because the failure is caused in part by a photo-chemical process (due to the substitution of Uvinul for Tinuvin), the failures occur gradually depending upon the direction and intensity of sun exposure and other factors.  Obviously, not every pane of glass at Pensacola Christian College shows signs of delamination and discoloring today.  The defect does not materialize at the same time in every pane of glass; even panes in the same building fail at different rates due to the variations of sun exposure to each pane.  Mr. Foxworth did not testify that "only nine panes" of glass are defective, but rather,

---

jury for the purposes of paying the claims at issue in this case.  Lastly, this Court limited the scope of Glasslam's damages in this case to those customers and claims that were identified in discovery. Thus, by the Court's ruling, the damages awarded for unpaid customer claims address those specific claims.

that the defect has begun to manifest itself at the college.[2]   Reichhold's argument that Glasslam should not be compensated for the funds it will take to replace the laminated glass at Pensacola Christian because "only nine panes" have showed signs of failure to date ignores mounds of evidence in the case Glasslam presented on causation and damage — which the jury accepted.

Reichhold also asserts that the damages the jury awarded Glasslam to replace the glass at Pensacola Christian are speculative because the college has not made a claim against Glasslam and the record does not support the *estimated* figure of $12 million for the replacement of the glass.  As detailed in the previous section, there is no legal requirement that a lawsuit be filed or threatened before Glasslam can collect the damages that flow naturally and consequentially from Reichhold's breach of the parties' contract and breach of the warranties.  The recoverable economic losses include the cost to replace the defective product.

Reichhold's real problem is that the costs of repair are quite high.  The record evidence shows, however, that Reichhold (1) *knew* that Glasslam would be using the resin in high-impact hurricane glass; (2) *knew* that a properly formulated resin was the key ingredient for the glass to perform its intended function; and (3) *knew* that Glasslam's production of the hurricane glass was increasing which is why Glasslam needed a much larger manufacturer to handle its resin demand.  It is undisputed that Glasslam told Reichhold to use Tinuvin 328 at .2 percent in the resin and, had Reichhold complied with the parties' express agreement, neither Glasslam nor Reichhold would be

---

[2]Glasslam's laminated glass was made for Pensacola Christian College between 1999 and 2001.  The fact that the glass is now (in 2004) beginning to delaminate and to show signs of the latent defect in the resin is directly consistent with the testimony of Glasslam's chemist, Dr. Fred Willard, who testified that the failures generally would occur within one to five years following installation.

CASE NO. 02-60703-CIV-DIMITROULEAS

faced with the burdensome and costly task of replacing high-impact hurricane glass that no longer serves its intended function. Breaching a contract and express and implied warranties can be costly. The law does not require that damages be calculated to the penny. Estimates and approximations derived from a reasonable basis are sufficient.[3] Mr. Foxworth testified, based on 30 years of experience in the glass laminating and window business, that it will cost two to three times as much to replace the defective glass than it cost to install it given the added difficulties associated with removing windows from an existing building. Mr. Foxworth testified that the cost for replacing the defective glass at Pensacola Christian would be between $12 to $18 million. Glasslam requested the lowest figure in closing argument, and the jury awarded Glasslam $12,000,000.00 for that job. In short, Glasslam is entitled to recover from Reichhold the costs necessary to replace the defective glass and the record evidence fully supports the amount awarded by the jury.

## II.   Out-of-Pocket Damages and Lost Profits: The jury's damage awards are supported by the evidence

### A.   Glasslam established that Reichhold's defective resin caused the failure of Safety Plus I and the corresponding profits

Reichhold's next argument is that the Court should vacate the jury's award of lost profits because, as a matter of law, Glasslam failed to establish causation, i.e., that Reichhold's breach of the contract led to Glasslam's loss of profits with respect to Safety Plus I. To the contrary, the record contains ample evidence establishing the fact that Reichhold's supply of defective resin ruined Glasslam's original product line, Safety Plus I, and eliminated the corresponding profits Glasslam was enjoying up to that time. The evidence supporting the jury's finding of causation is briefly detailed next.

---

[3]See the legal authorities set out in the prior section.

8

CASE NO. 02-60703-CIV-DIMITROULEAS

Until Reichhold manufactured and delivered defective resin to Glasslam, the company had several years of impressive revenue growth and corresponding profits. After Hurricane Andrew devastated Dade County, Steve Howes began developing a high-impact hurricane glass that would meet the stringent requirements set out in Dade County's new building code. Through Steve Howes, Glasslam spent years developing what came to be known as the Safety Plus I high-impact hurricane window system. Glasslam tested its new product extensively. Glasslam subjected the window system (which included the glass made with Silmar resin) to a six-month weatherability test designed to simulate years of exposure to the elements, including ultra violet light. The window system and the glass component passed the tests, including the subsequent large missile impact test performed at the Hurricane Testing Lab. The product was approved by the Dade County Building Department as a window system that meets the requirements of the new code in approximately 1997. At that time, Glasslam's sales soared. Glasslam's sales grew as the Dade County Building Code was adopted by other local counties and, eventually by the State of Florida. Since the Dade County Building Code was born out of the experience of Hurricane Andrew, other coastal states began adopting it as well and Glasslam experienced a corresponding growth in revenues and profits from the sale of Safety Plus I.

Reichhold entered the picture as Glasslam's sales were soaring and Silmar (the original manufacturer of the resin) could no longer keep up with Glasslam's resin demands. Glasslam requested and Reichhold agreed to "match" the Silmar resin and Glasslam specifically stated that the resin must include Tinuvin 328 at .2 percent. Glasslam made this specific request because Mr. Howes knew that the Silmar had passed the six-month weatherability test and the subsequent large missile impact test — i.e., he knew that the Silmar resin formulation worked. Contrary to its promises,

Reichhold did not match the Silmar resin and later switched the Uvinul for Tinuvin, a key ingredient in the recipe.  As the glass in the window systems that were now in the field began discoloring and delaminating, Glasslam began receiving customer complaints.   Despite Glasslam's efforts to determine the source of the problems — efforts thwarted by Reichhold's misrepresentation that Tinuvin was still being used in the resin — and to appease unhappy customers, Glasslam began losing business.  As the problems with the laminated glass grew, Glasslam's revenues declined.  Eventually, Glasslam learned that window failures were the result of defective resin Reichhold had supplied.  In an effort to save its business, Glasslam began developing a new window system called Safety Plus II which ultimately took the place of Safety Plus I.

Reichhold incorrectly characterizes the evidence presented at trial regarding Glasslam's customer base and ignores other testimony directly on point.  Reichhold's spin on the evidence is that only two customers out of 57 stopped doing business with Glasslam.  Out of the 11 customers that have sought reimbursement for specific jobs, two stopped doing business with Glasslam altogether. The other nine — which Reichhold fails to mention — continued using Safety Plus I *only because* Glasslam assured them that it was no longer using Reichhold resin, but rather, Silmar resin.  By that time, however, the reputation of Safety Plus I in the industry was ruined and sales dropped dramatically.   These nine customers agreed to continue doing business with Glasslam because Glasslam was developing a new product not tainted by the history of problems created by Reichhold's defective resin.  The fact is (and the evidence showed) that Reichhold's supply of defective resin brought Glasslam's sales of Safety Plus I to a virtual halt.  Reichhold also fails to mention Mr. Howes' testimony on redirect examination that out of the remaining 46 customers on the list, 40 stopped doing business with Glasslam as a direct result of problems created by Reichhold's defective

CASE NO. 02-60703-CIV-DIMITROULEAS

resin. Reichhold's statement that only two customer's stopped doing business with Glasslam is a gross misstatement of the evidence. Glasslam lost approximately 42 customers and the others remained as a result of Glasslam's development of Safety Plus II.

Glasslam's lost profit analysis is based on the demise of the Safety Plus I product line which was directly linked in the evidence to the defective resin Reichhold manufactured. Glasslam mitigated its damages, as best it could, by developing Safety Plus II. The loss of many customers, the significantly reduced sales of Safety Plus I, and the switch to Safety Plus II by those customers that remained accounted for the decline in revenues and profits which had previously been generated with regularity by Safety Plus I. Glasslam's expert accountant calculated lost profits taking all of these factors into consideration, including Glasslam's mitigation of its losses. Again, Reichhold's incorrect version of the evidence does not support its conclusion that Glasslam failed to establish causation with respect to damages. Reichhold forgets that the evidence must be viewed in the light most favorable to the jury's verdict at this stage of the case.

**B.      The Court properly allowed Mr. Patella to testify regarding the amount of lost profits taking the officer's salary into account**

Defendant Reichhold filed a post-trial motion to strike Mr. Patella's testimony in which it raised the same arguments made here, i.e., that Glasslam should not have been permitted to recall Mr. Patella for the purpose of providing a lost profit damage figure that took an officer's salary into consideration. Glasslam's response to that motion addresses these issues and, for ease of reference, is reprinted next.

11

i.     **Mr. Patella's methodology for calculating lost profits comports with Florida law**

Defendant Reichhold contends that Mr. Patella's testimony should be stricken because his method of calculating lost profits conflicts with Florida law.  Florida law provides that the preferable method of calculating lost profits is to establish "proof of profits for a reasonable time anterior to the breach." *G.M. Brod & Company, Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1537 (11th Cir. 1985) *citing A&P Bakery Supply & Equipment Co. v. Hawatmeh*, 388 So. 2d 1071, 1072 (Fla. 3d DCA 1980).  This "before and after" methodology is the exact methodology used by Mr. Patella and recognized by this Circuit as one of the two generally accepted methods to establish lost profits. *G.M. Brod*, at 1138 ("the before and after theory" is one of the "two generally recognized methods of proving lost profits").

Mr. Patella compared Glasslam's profits generated by the Safety Plus I hurricane window system prior to the distribution of the defective resin to profits generated by that same product afterwards.  Mr. Patella then subtracted Glasslam's expenses, i.e., the cost of doing business with respect to that product line.  Mr. Patella had several years of historical data regarding Glasslam's track record for profits and expenses on the Safety Plus I product and that history formed the basis of his opinion as to how those profits would have progressed in the future but for Reichhold's supply of defective resin.[4]  In fact, Mr. Patella employed the same methodology utilized by Reichhold's expert (gross profits minus expenses) with the exception of the growth rate figure used to project future

---

[4]In *Club Car* — the one case Reichhold cited on the admissibility of lost profit testimony — the expert did not deduct *any expenses* in arriving at his opinion as to the company's lost profits. Accordingly, the district court struck the witness' testimony on that issue. *Club Car, Inc. v. Club Car (Quebec) Import Inc.*, 362 F.3d 775, 780 (11th Cir. 2004).  Since Mr. Patella did subtract expenses in his calculations, *Club Car* is not remotely applicable to this case.

12

CASE NO. 02-60703-CIV-DIMITROULEAS

profits.[5]   Having utilized a well-established method of determining Glasslam's lost profits,

Reichhold's general attack on the validity of Mr. Patella's testimony fails.

### ii.   Mr. Patella provided an opinion as to lost profits that included in the cost of doing business a deduction for officer's salary

The only specific objection Reichhold raises to Mr. Patella's testimony is that he allegedly

failed to deduct an amount for salaries paid to officers from the expense aspect of the equation.

During the trial, Reichhold argued that Mr. Patella's testimony was flawed for this reason — citing

*Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 943 F.2d 1511 (11th

Cir. 1991). Rather than arguing about Reichhold's legal position, Glasslam recalled Mr. Patella and

had him deduct the salary expense.  After running this calculation, Mr. Patella testified as to the

amount of lost profits taking the salary paid to Glasslam's officer into account. The addition of this

expense decreased Mr. Patella's lost profit figure from approximately $7.5 million to $6.5 million.

In closing argument, Glasslam argued that the jury should accept the lower figure as the appropriate

amount of lost profits, which it did.  In short, Mr. Patella provided the testimony that Reichhold

claims was necessary, and the jury based its lost profit award on that reduced figure.

### iii.   This Court did not abuse its discretion in allowing Glasslam to recall Mr. Patella

At trial and in its motion, Reichhold argues that the Court erred in permitting Glasslam to

recall Mr. Patella on this issue.  The Court noted, however, at the time that it has broad discretion in

---

[5]Reichhold's expert projected Glasslam's profits to increase by no more than the GNP, i.e., by 2 percent a year, despite substantial competent evidence that Glasslam's profits had been increasing at much higher rates over several years leading up to Reichhold's distribution of the defective resin.  Mr. Patella used an average projected growth rate that took this evidence into account.  As the Eleventh Circuit held in *G.M. Brod*, perceived fallacies in an expert witness' opinions and damage figures are left to vigorous cross examination and, ultimately, disputes concerning profitability are for the jury.  759 F.2d at 1538.

CASE NO. 02-60703-CIV-DIMITROULEAS

the presentation of evidence at trial, including rebuttal evidence.  Not only does the Court have discretion in determining what constitutes rebuttal evidence, but also the Court has *sole* discretion to allow a party to present evidence on rebuttal that "could have been received as part of the case in chief." *U.S. v. Sadler*, 488 F.2d 434, 435 (5th Cir. 1974).  *See also, U.S. v. Bulman*, 667 F.2d 1374, 1382 (11th Cir. 1982) ("Trial court has discretion to admit on rebuttal evidence that which would have been admissible during case in chief").  Similarly, the reopening of a case is left to the sound discretion of the district court.  *U.S. v. 1972 44" Striker, Bonanza*, 753 F.2d 867, 869 (11th Cir. 1985).  Thus, whether "on grounds of rebuttal or reopening the case," this Court acted well within the bounds of its discretion in permitting Glasslam to recall Mr. Patella.  *U.S. v. Willis*, 759 F.2d 1486, 1502 (11th Cir. 1985).

In addition to this being a matter of discretion, the Court's decision to allow Mr. Patella to testify as to the effect of the salary deduction on the lost profit damage figure was correct.  Reichhold relies exclusively on the Eleventh Circuit's decision in *Ad-Vantage* for its position that a deduction for salaries is legally necessary, but misses altogether the relief afforded by the Eleventh Circuit in that case.  The Eleventh Circuit reversed *for a trial on damages* despite the fact that the plaintiff had not presented evidence of salary deductions prior to resting, at which time the district court granted a directed verdict.  *Ad-Vantage*, 943 F.2d at 1519.  The alleged defect in the calculation did not translate into a judgment in favor of the defendant.  *Id.*  By allowing Glasslam to present this additional testimony, the Court cured the deficiency which, according to Reichhold, existed and would have required a new trial.  Certainly, it is within this Court's discretion to take action during trial that will potentially prevent the necessity of a new trial and the concomitant waste of judicial resources.  *Lundgren v. McDaniel*, 814 F.2d 600, 606-607 (11th Cir. 1987) (even if Florida law

prohibited the reopening of a case to show compliance with statutory notice prerequisite, district court did not abuse its discretion in reopening the evidence to allow proof of the condition precedent).

The gist of Reichhold's argument is that it had the right to point out alleged error during the course of the trial, but the Court did not have the right or discretion to allow the alleged error to be corrected. The Court's role in presiding over a trial is more than that of a moderator who merely keeps the courtroom in order. In response to Reichhold's claim of error, Glasslam requested an opportunity to recall Mr. Patella for him to testify, in an abundance of caution, as to how a deduction of the amount of an officer's salary would change the lost profit damage figure. As noted earlier, the Court acted well within its discretion in granting Glasslam's request for numerous reasons. Reichhold opposed this relief which, ironically, would have constituted invited error had Reichhold convinced the Court to deny Glasslam's request. *In re Carbon Dioxide Industry Antitrust Litigation*, 229 F.3d 1321, 1326-1327 (11th Cir. 2000). Clearly, the Court reached the correct decision in permitting Mr. Patella to testify prior to the close of the evidence and the testimony he provided resolved the complaint raised by Reichhold in this motion. Glasslam argued in closing that its lost profits were equal to the lower figure and the jury agreed. Thus, Reichhold's motion for judgment as a matter of law relating to Mr. Patella's testimony should be denied.

**C.      Glasslam established the amount of its out-of-pocket damages at trial**

**Cost to develop Safety Plus II**. Steve Howes testified at trial that Glasslam had to develop a new product line in order to save what customers it could when the problems with Safety Plus I became known in the industry. Mr. Howes testified as to what went into developing the new product line, Safety Plus II, including extensive weatherability testing and approval by the Dade County Building Department. In turn, Glasslam's accountant, Sal Cuccia, testified as to the amount of money

Glasslam incurred in getting Safety Plus II ready for the market. Clearly, it was Mr. Howes who knew why these costs were incurred, whether they were reasonable and why Reichhold should have to pay them. The evidence showed that Glasslam incurred the costs as a direct result of the reputation of its prior product, Safety Plus I, being ruined by Reichhold's supply of defective resin. Moreover, Reichhold never challenged the reasonableness of the steps Mr. Howes took in developing the new product line. Mr. Cuccia merely testified as to the costs Glasslam incurred in that endeavor. Reichhold's complaints about Mr. Cuccia's testimony were covered in cross examination and go the weight of his testimony, which Reichhold argued to the jury in closing. The jury concluded that Glasslam should be compensated for having to develop a new product line and that finding is supported by the evidence introduced at trial. Thus, the jury's award must stand.

      **Customer credits, discounts and warranty payments.** Reichhold makes the same argument with respect to the customer credits, discounts and warranty payments Glasslam made and those which it owes. Again, through Mr. Howes' testimony and the records introduced at trial through Mr. Cuccia, Glasslam established its out-of-pocket damages with certainty. In fact, the jury awarded Glasslam (to the dollar) the amount of out-of-pocket damages Glasslam argued in closing that it had sustained. The figures Glasslam's counsel provided the jury were based on direct evidence produced during the trial. Mr. Howes testified that Glasslam gave all of these credits, discounts and payments as a direct result of the defective resin Reichhold manufactured and Glasslam unknowingly supplied to its customers. The record contains substantial evidence of Glasslam's out-of-pocket damages, evidence which the jury accepted in awarding those damages to Glasslam. Reichhold's argument should accordingly be rejected.

16

CASE NO. 02-60703-CIV-DIMITROULEAS

**III.    Glasslam proved all the elements of its claim with respect to Resins 38, 29 and 38-45**

**Damages caused by Resin 38.**   Contrary to Reichhold's assertions, Glasslam did establish that it sustained damage as a result of Resin 38.  It is undisputed that Reichhold failed to formulate Resin 38 with the correct percentage of Tinuvin 328.  Resin 38 contained one-half of the Tinuvin requested by Glasslam and necessary to effectively absorb ultra violet light.  Reichhold's assertion that Dr. Willard had no opinions regarding the defective nature of 38 is wrong.  Dr. Willard testified that Resin 38 did not sufficiently absorb ultra violet light since it had been formulated with only .1 percent of Tinuvin.  Dr. Willard also testified that Resin 38 (like Resin 29 and Resin 38-45) was defective when manufactured and will fail.  Moreover, Glasslam presented evidence that glass made with Resin 38 *had* failed.  Norman Foxworth and Steve Howes testified at trial that the glass installed in the Longvue Gardens project had failed as a result of Reichhold's supply of defective resin. Glasslam paid Mr. Foxworth $16,616.00 as a result of the failure, and this is the exact amount of out-of-pocket damages the jury awarded with respect to Resin 38.   The record evidence belies Reichhold's argument on this issue.

**Causation as to Resins 29 and 38-45**.  Reichhold also argues that Glasslam failed to prove causation, i.e., that the defective resin caused the problems seen in the pieces of glass introduced as evidence at trial.   Reichhold's argument in that regard ignores the testimony of Dr. Willard, Glasslam's chemist, and the testimony of multiple witnesses who confirmed that the glass at issue at every job site referenced in this case was manufactured with Reichhold resin.  Respectfully, it is as if Reichhold were at a different trial.  Dr. Willard's opinion was two-fold.  First, Reichhold's substitution of Uvinul for Tinuvin made a difference because Uvinul absorbs ultra violet light at lower nanometers than Tinuvin.  In laymen's terms, Uvinul is less effective at absorbing the harmful effects

17

CASE NO. 02-60703-CIV-DIMITROULEAS

of ultra violet light than Tinuvin. Second, Dr. Willard testified that the resin had been undercooked. Whether in conjunction with one another or separately, these factors rendered the resin defective for its intended use and resulted in the failures evidenced at trial in the glass samples.

For example, the Bahamas glass had undergone a photo-chemical breakdown (as a result of the defective resin) which caused the glass to yellow where it had been exposed to sunlight. This photo-chemical process, as well as delamination, was clearly evident when the mullions were removed from the glass. The same is true with the blue glass removed from Jackson Hospital. The glass taken from the First Data Building demonstrated delamination, yellowing and another defect, i.e., the breakdown and failure of the PET film. The ultra violet light absorber in the resin protects the PET film which is rendered ineffective by sunlight. The PET film is the component part of the laminated glass that prevents missiles from penetrating the glass in a hurricane. The glass taken from the First Data Building failed the large missile impact test conducted at the Hurricane Testing Laboratory in Dade County. The evidence showed that the glass in the First Data Building had been manufactured with Reichhold resin and that, after just a few years of sunlight exposure, the glass failed the impact test. Dr. Willard attributed this failure to the defective resin Reichhold manufactured.

Having established that the glass used in the windows at every job site in this case (Jackson Hospital, McNay Museum, First Data Building, Bahamas complex, Pensacola Christian and Pier 66 to name a few) was manufactured with Reichhold resin, Glasslam made the necessary link between Reichhold's defective resin and the failures that are just beginning to manifest themselves in the field. Dr. Willard provided the scientific explanation for the failures and Glasslam linked those failures to Reichhold resin. In short, Glasslam more than adequately established causation. Glasslam's evidence

18

CASE NO. 02-60703-CIV-DIMITROULEAS

created a question of fact for the jury on causation, and the jury resolved that issue in Glasslam's favor. Reichhold's contention that Glasslam failed to establish causation as a matter of law is not supported by the record.[6]

**IV.    The Court correctly entered a directed verdict against Reichhold on the settlement agreement where Reichhold failed to present any evidence of the agreement's meaning**

Lastly, Reichhold argues that the Court erred in ruling on summary judgment that the Settlement Agreement and Release executed by the parties in December of 2000 was ambiguous. The Court reviewed the Settlement Agreement and Release at length and concluded that it was in fact ambiguous as to its scope:

> Upon examination of the Settlement Agreement in the instant case, *the Court is unable to determine the exact scope or precise implications of the Agreement.* The Agreement attempts to release Reichhold from "certain claims," but such claims are not defined in the Agreement. In certain areas, however, the word "claims" is capitalized thereby intimating to some extent that the parties intended for the Agreement to encompass a defined set of claims. *However, without more information, any efforts by this Court to articulate the exact scope of those claims would be pure speculation.*
>
> \*       \*       \*
>
> Furthermore, as the "claims" are not defined in the Agreement, and resolving doubts on this issue in favor of the nonmoving party, *the Court finds that the Agreement is ambiguous with respect to the claims released.*

---

[6]In addition to the defective resin that Reichhold supplied Glasslam, Reichhold also shipped a wrong batch of resin to Glasslam which was mislabeled Resin 38-45. Reichhold shipped the wrong batch of resin through its distributor, Polyguard. Reichhold never presented evidence to contradict the testimony of the Polyguard representative who confirmed that Polyguard received an incorrect tanker of resin from Reichhold's Texas plant that was then forwarded to Glasslam in drums. After distributing this 'wrong resin' to its customers, Glasslam had to reimburse those customers for costs they incurred in making laminated glass with the wrong resin. These are additional damages Glasslam sustained in connection with Resin 38-45. The jury's damage award for Resin 38-45 is also consistent with this evidence produced at trial.

CASE NO. 02-60703-CIV-DIMITROULEAS

Order on Reichhold's Motion for Partial Summary Judgment, pp. 8-9, dated April 27, 2004. Even a cursory review of the Agreement shows that the Court's conclusion that it is ambiguous with respect to its scope is correct.

In addition, despite having the opportunity to provide the Court and the jury "more information" regarding the intended scope of the Agreement, Reichhold elected not to call any witnesses on this issue at trial. Reichhold did not present the testimony of the employee or agent who drafted the Agreement, who presumably would have testified that Reichhold intended the Agreement to be all encompassing. Similarly, Reichhold did not present the testimony of the employee or agent who negotiated the Agreement with Mr. Howes. Reichhold did not present any parol evidence whatsoever to clarify the ambiguity and, had it done so, the question of the Agreement's scope would have been resolved by the jury. Instead, the record evidence is limited to Mr. Howes' testimony that the Agreement was not intended to release the claims at issue in this case, particularly since he did not know at the time that Reichhold had unilaterally changed the resin formula.

In light of Glasslam's evidence on the issue of intent and Reichhold's lack of evidence, the Court granted Glasslam's Rule 50 motion, ruling as follows:

> After finding that the Settlement Agreement was ambiguous on its face, the parties were required to demonstrate their intent through evidence presented to the jury. Accordingly, the Plaintiff presented sworn testimony that the Agreement related solely to the problems with "lumpy" resin. Such testimony was uncontradicted by the Defendant. Therefore, *considering the Defendant drafted the Agreement and then failed to present any evidence of an intent contrary to that of the Plaintiff*, it is ORDERED AND ADJUDGED that *Glasslam's Rule 50 Motion* for Judgment as a Matter of Law on Reichhold's defense of the Settlement Agreement *is hereby GRANTED.*

See Order Granting Plaintiff's Motion for Judgment as a Matter of Law on the Settlement Agreement, p. 2, dated May 21, 2004. As the Court noted, Reichhold had the opportunity to present evidence that

20

CASE NO. 02-60703-CIV-DIMITROULEAS

Reichhold intended for the Agreement to release the claims in this case, but it did not. Through the

testimony of Mr. Howes, Glasslam established the parties' intent. The Court's initial ruling that the

Agreement was ambiguous is supported by the Agreement itself, and the Court's subsequent ruling

at trial regarding the parties' intent is supported by the uncontradicted evidence. Thus, Reichhold's

motion for judgment as a matter of law on its Settlement Agreement defense should be denied.

## CONCLUSION

Based on the foregoing facts, arguments and authorities, Plaintiff Glasslam respectfully

submits that Defendant Reichhold's motion for judgment as a matter of law should be denied.

Respectfully submitted,

**WILLIAMS & HEFFLING**
316 Banyan Boulevard
West Palm Beach, Florida 33401
-and-
**THE BOLDT LAW FIRM**
Boca Plaza, Suite 203
299 West Camino Gardens Boulevard
Boca Raton, Florida 33432
Telephone (561) 955-0045

By: _____
KIMBERLY L. BOLDT
Fla. Bar No. 957399

CASE NO. 02-60703-CIV-DIMITROULEAS

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of Plaintiff Glasslam's Response in Opposition to Defendant Reichhold's Motion for Judgment as a Matter of Law was sent via facsimile and U.S. Mail this 24th day of June, 2004, to: **Fred J. Lotterhos, III, Esquire**, and **Dan Bean, Esquire,** Holland & Knight LLP, 50 N. Laura Street, Suite 3900, Jacksonville, Florida 32202.